# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**BARBARA A. MCCASTLER,**

**-vs-**                                    **Case No. 6:07-cv-1684-Orl-28GJK**

**COMMISSIONER OF SOCIAL
SECURITY,**

_____

# REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

Plaintiff Barbara A. McCastler ("McCastler") appeals to the district court from a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for disability insurance benefits. *See* Doc. No. 1 (the "Complaint"). For the reasons set forth below, the undersigned recommends that the Commissioner's decision be **REVERSED and REMANDED under sentence four of 42 U.S.C. § 405(g)**.

## I.     BACKGROUND

McCastler was born on February 9, 1963, and was forty-three years old at the time of the hearing. R. 298. McCastler received her high school diploma and worked as a maid in various hotels from 1983 through 1999. R. 299-300. McCastler's work required her to be on her feet most of the time and to frequently lift fifteen pounds. R. 300.[1]

_____

[1] In McCastler's Disability Report, she stated that was required to lift as much as fifty pounds during her employment. R. 78.

McCastler applied for disability benefits on December 16, 2004. R. 73-75. In her application for disability insurance benefits, McCastler states that her onset of disability occurred on June 19, 2001. R. 73. In her application, McCastler states that her disability is caused by arthritis, a slipped disc, carpal tunnel syndrome in both hands, and knee problems. R. 76. Prior to alleged onset date, McCastler suffered a back injury as a result of motor vehicle accident in 1995. R. 261.[2] In 1997, McCastler received treatment from Dr. Janet M. Robison of the Jewett Orthopaedic Clinic ("Jewett"), for right knee pain purportedly after being injured while riding a theme park ride. R. 221.[3] McCastler underwent surgery in 1997 for multiple hernias in her abdomen, after which she spent several days in the hospital. R. 219. On November 18, 1998, McCastler returned to Dr. Robison complaining of persistent bilateral right knee pain. R. 217.[4]

On January 5, 1999, McCastler presented to Jewett with mid to lower back pain and right leg pain which had purportedly persisted for three years. R. 216.

> She states that the pain radiates into the right buttock and right entire leg. She admits to numbness of her bilateral lower extremities after sitting on the floor or sitting on the side of her bed for prolonged periods of time. She denies . . . any weakness. She denies any night pain that awakens her. Walking, standing, sitting or lifting aggravate her mid to low back pain. She rates her back pain and mid pain as an 8 on a scale of 10, and her right leg pain a 5 on a scale of 10.

---

[2] Dr. Gregory Munson, M.D. ("Dr. Munson"), of the Jewett Orthopaedic Clinic, P.A., treated McCastler for degenerative disc disease, and his September 30, 2002, notes reflect that McCastler "had a prior back injury in 1995, when her car was rear-ended. She says she has never had 100% recovery, but she has been able to be functional since that incident. She sought chiropractic care which was the sole treatment for that incident." R. 261.

[3] On August 27, 1997, McCastler was prescribed formalized physical therapy, placed on medication and given a lateral J knee support to wear at work for her right knee pain. R. 220-21. McCastler stopped attending physical therapy because of its expense, and she was prescribed a home therapy exercise program. R. 218.

[4] Dr. Robison's notes reflect that McCastler returned "primarily . . . because she says she needs a note for work saying she cannot do as much climbing and squatting." R. 217. Dr Robison's notes also state McCastler had "not been doing any exercises or taking any medication." *Id.* Dr. Robison's impression was that McCastler had "probable patellar chondromalacia" of the right knee. *Id.*

R. 216. On January 15, 1999, McCastler had an MRI showing: moderate L5-S1 disc dehydration with a posterior annular tear and bulge without herniation or stenosis; minimal L4-5 disc bulging without herniation or stenosis; and normal lumbar levels on the remaining discs. R. 257. The MRI revealed that "[t]here is no disc herniation or any neural element compression as a cause of her pain." R. 214. Physical therapy with modalities and stabilization of the lumbar spine were recommended along with an anti-inflammatory medication. *Id*. McCastler was provided with a doctor's note indicating that she should be placed on light duty requiring no lifting over thirty pounds. *Id*.

On March 18, 1999, McCastler presented to Dr. Robison with worsening bilateral knee pain. R. 211. Dr. Robison's notes reflect the following:

> She has had worsening bilateral knee pain. She is trying to get on disability because of her back and knees. Her right knee is much worse than her left but they both hurt. She has not had any mechanical symptoms just pain and swelling. She has been taking anti-inflammatories intermittently for her back. She has been working on a home exercise program. She notices significant crepitance in her knees.

R. 211. Dr. Robison's impressions were degenerative joint disease, patellofemoral joint right knee, and anterior pain in the left knee. R. 211. Dr. Robison recommended McCastler continue to ice her knees regularly, lose weight, and continue the home exercise program. *Id*. Dr. Robison provided McCastler with a note for her employer stating that McCastler should work less hours. *Id*.

On March 19, 1999, McCastler returned to Jewett experiencing "a significant amount of low back pain and right leg pain" along with neck pain and bilateral upper extremity pain, greater in the right shoulder than the left shoulder. R. 213. "She admits to tingling, pins and needles and

numbness of her bilateral upper extremities." *Id.* McCastler reported to a physician's assistant that she went to two formalized physical therapy visits for the lumbar spine, but it made her knees sore, so she stopped attending physical therapy. *Id.* The physician's assistant's impressions were cervicalgia, bilateral upper extremity pain and radicular symptoms, low back pain, lumbar spine degenerative disc disease, and mild sciatica of the right lower extremity. *Id.* The physician's assistant recommended another MRI of the cervical spine "to rule out a disc herniation vs. any neural element compression as the cause of her neck pain and bilateral upper extremity pain and numbness." R. 212.[5]

On April 1, 1999, McCastler returned to Jewett for continued evaluation of her pain. R. 210. McCastler continued to experience the same symptoms along with additional symptoms. *Id.* "Constant use of her hands, such as writing or use of the hand causes numbness of her right hand greater than the left." *Id.* McCastler's pain was also causing her to awaken at night. *Id.* A review of the MRI ordered in March revealed that the discs of the cervical spine were well hydrated, no disc herniation, and no neural compression were present. *Id.* The physician's assistant ordered an EMG of the bilateral upper extremities. *Id.* McCastler was provided with another note for her employer stating that she was to do no lifting over 30 pounds and no excessive bending, lifting, twisting, or stooping until after the EMG results were obtained. *Id.*

On May 25, 1999, McCastler presented to Dr. Wadih S. Macksoud at Jewett to review the results of the EMG. R. 209.

> The [EMG] studies were negative on the left but showed a very severely involved right carpal tunnel syndrome on her right. This would explain the patient's numbness, tingling, pain, night awakening and pain with use.

---

[5] The physician's assistant's chart was reviewed by Dr. Reginald L. Tall. R. 212.

R. 209. Dr. Macksoud prescribed a splint, stated he would monitor McCastler's condition, and if her condition did not improve, "she will need surgical release." R. 209. "She continues to work without restrictions as long as she wears her splints at night." *Id.* On June 8, 1999, McCastler returned to Dr. Macksoud without a change in her condition. R. 208. She was injected with cortisone and Xylocaine. *Id.* On June 25, 1999, McCastler's hand numbness and tingling were "significantly better," but her right shoulder was bothering her during rotation. R. 207. X-rays of the shoulder did not show any abnormalities, but Dr. Macksoud injected McCastler with subacromial steroids. R. 207.

On July 9, 1999, the right carpal tunnel syndrome returned, but with mild symptoms. R. 206. However, McCastler was experiencing pain and numbness in her left hand. Dr. Macksoud injected her left carpal tunnel. R. 206. On August 6, 1999, McCastler was continuing to have numbness, tingling, and pain in both hands. R. 205. Therefore, Dr. Macksoud scheduled McCastler for surgery. R. 205.

On October 27, 1999 and December 1, 1999, prior to the alleged onset date, McCastler underwent surgical procedures known as carpal tunnel release in each hand. R. 255, 258. On December 9, 1999, Dr. Macksoud stated that McCastler could return to work on December 18, 1999, "with limited use of the left hand with no repetitive use and no more than a few pounds of lifting/carrying and no strong grip." R. 198. On December 21, 1999, McCastler was still experiencing pain in her left hand. R. 197. Dr. Macksoud's notes reflect the following:

> She does, however, need to be on light duty for at least another month. She should avoid squeeze bottles, heavy lifting over 5-10 pounds and avoid repetitive use of . . . both hands. Hopefully, her employer can find work . . . that fits her limitations.

R. 197.   On January 18, 2000, McCastler presented to Dr. Macksoud with triggering and catching in her right thumb.  R. 196.  Dr. Macksoud stated that McCastler's problems were probably due to swelling from the surgery, and he injected the thumb with cortisone and Xylocaine.  R. 196.  Dr. Macksoud notes also reflect the McCastler "should be able to return to work on 1-21-00 without restrictions." *Id.*   On January 27, 2000, McCastler presented to Dr. Macksoud complaining of "a feeling of cold going down from the wrist into the forearm with use of the right hand."  R. 195.  Dr. Macksoud reported that she had a full range of motion, no swelling, ecchymosis, or bruising. *Id.*  Dr. Macksoud told McCastler that the sensations she was experiencing were part of the process for the nerve to heal.  R. 195.  Dr. Macksoud's notes state that McCastler "should reach maximum medical improvement as of 3-1-00 with a 0% permanent impairment and no restrictions."  R 195.  Thereafter, McCastler experienced significant improvement in her carpal tunnel symptoms until approximately May 12, 2005.  R. 227.

At some point between December 1999 and Mach 1, 2000, McCastler was terminated from her employment.  R. 301.  She has not had gainful employment since that time.  R. 301.

On July 21, 2000, McCastler returned to Jewett for low back pain and bilateral lower extremity pain.  R. 193.  She was examined by a physician's assistant.  R. 193.[6]

> She states that her symptoms have worsened.  Standing at her sink, washing dishes aggravates her symptoms.   Standing to cook aggravates her back pain.  Sitting on her side cause her legs to go numb.  Driving causes her ankles to swell.  She has had physical therapy, which has not helped her symptoms and has aggravated her knees. . . . She is presently not working.  She rates her back pain a 4-5 on a scale of 10; bilateral lower extremity pain a 5 on a scale of 10.  She admits to a history of arthritis of her knees.

---

[6] Dr. Tall reviewed the chart.  R. 192.  Unless otherwise stated herein, whenever McCastler was treated by a physician's assistant, Dr. Tall always reviewed the chart.

R. 193. The physician's assistant again recommended a full course of physical therapy to include modalities and stabilization of the lumbar spine. R. 192. On August 11, 2000, McCastler presented to Dr. Robison at Jewett complaining of worsening bilateral knee pain in the anterior portion of her knees. R. 191. While McCastler did not have any knee pain while walking on flat surfaces, she could not go up and down stairs or squat. R. 191. Dr. Robison discussed icing the areas, working on range of motion and strengthening exercises, and wearing shoes with arch support. R. 191. Dr. Robison gave McCastler some more anti-inflammatories. R. 191. On September 13, 2000, McCastler presented with worsening pain in her left knee, and reported that the anti-inflammatories did not help. R. 190. X-rays reflected no acute bony abnormalities, but mild lateral subluxation of the patella in the left knee. R. 190. McCastler reported that she cannot return to physical therapy because she has a history of back problems and physical therapy aggravates those problems. R. 190. Dr. Robison injected McCastler with Kenalog and Marcaine, and told her to continue icing the knee. R. 190.

On October 13, 2000, McCastler presented to Dr. Robison with worsening right knee pain. R. 189. McCastler reported that the injections in her left knee "really seemed to help her left knee." R. 189. Dr. Robison injected McCastler's right knee with Kenalog and Marcaine. R. 189.

On October 16, 2000, McCastler present to Dr. Macksoud at Jewett with right thumb pain. R. 188. X-rays did not show any major abnormalities at the joint or the wrist. R. 188. Dr. Macksoud injected McCastler's right thumb with Kenalog and Xylocaine. R. 188.

On November 6, 2000, McCastler returned to Dr. Robison complaining that both her knees were getting worse and that the injections did not help. R. 187.

> She is still having bilateral knee pain and complains about the persistent pain. She did not have improvement on her previous anti-

> inflammatories. The injection did not seem to help. She absolutely
> refuses to do any [physical] therapy because she says she has been
> to therapy before and she has some low back problems. She has not
> had any mechanical symptoms or instability, just pain.

R. 187. Dr. Robison's impressions were bilateral anterior knee pain and probable chondromalacia.

R. 187.[7] Dr. Robison discussed the possibility of an MRI and a diagnostic arthroscopy with

McCastler. R. 187. On December 15, 2000, Dr. Robison ordered an MRI of McCastler's right

knee. R. 186. The MRI was conducted on December 26, 2000. R. 253-54.

On January 5, 2001, McCastler presented to Dr. Robison for a review of the MRI. R. 185.

McCastler complained of persistent anterior pain in her knees, "particularly with getting up and

down off the toilet and getting up and down stairs." R. 185. X-rays and the MRI of the right knee

were significant for the following:

> . . . broad based, full thickness chondral loss involving the lateral
> patellar facet with moderate underlying bony changes and mild to
> moderate thinning and irregularity of the articular cartilage of the
> medial facet. There is a possibility of a small focal area of tearing or
> fraying of the medical meniscus. There is mild joint effusion and a
> small popliteal cyst.

R. 185; *see also* R. 253-54. Dr. Robison and McCastler discussed diagnostic arthroscopy. R. 185.

According to Dr. Robison's notes, McCastler understood that "she may or may not have

improvement in her pain, particularly if her arthritis under her patella is bad." R. 185. McCastler

stated that she did not want to get "anymore aggressive with her treatment at this point." R. 185.

On January 17, 2001, McCastler presented to the physician's assistant at Jewett

complaining of right sided lower back pain radiating into the right hip and right leg. R. 184. The

physician's assistant again recommended physical therapy, the notes reflect that McCastler

---

[7] Chondromalacia is a "softening of any cartilage." *Stedman's Medical Dictionary*, 26th Ed. (1995).

declined because "she was unable to do it because it aggravated her knee pain." R. 184. On January 19, 2001, another MRI of McCastler's lumbar spine was conducted. R. 245-46. The MRI of the lumbar spine revealed "no large disc extrusion or severe central narrowing. She has some moderate disc dehydration at L5-S1 with some mild facet arthropathy at L4-5 and L5-S1." R. 183; *see also* R. 245-46. The physician's assistant recommended epidural steroid injections into the lumbar spine. R. 183.

On July 18, 2001, McCastler presented to Dr. Brian K. Barnard at Jewett concerning her hands. R. 181-82. McCastler was experiencing pain in both hands. R. 182. Dr. Barnard's notes indicate a "sprain of the radial collateral ligament of the MP joint of the right thumb" and pain at the basilar joints of both thumbs. R. 181-82. Dr. Barnard prescribed fitted Cool Comfort splints for both hands and Vioxx. R. 181. On September 12, 2001, McCastler reported to Dr. Bernard significant improvement in her hands as a result of wearing the splints and taking Vioxx. R. 177.

On August 6, 2001, McCastler presented to Dr. Robison with left knee pain she experienced after "allegedly falling in sand on 7/27/01." R. 180. X-rays revealed mild degenerative changes at her patellofemoral joint and medial compartment. R. 180. Dr. Robison discussed icing her knees and again recommended physical therapy. R. 180. McCastler declined to undergo any physical therapy. R. 180. Dr. Robison injected McCastler with Kenalog and Marcaine. R. 180. On September 6, 2001, McCastler reported to Dr. Robison that the injection helped her "about 50%". R. 178. Dr. Robison again suggested a diagnostic arthroscopy, but McCastler stated that "[s]he is not really interested in getting any more aggressive at this point." R. 178.

On September 28, 2001 and November 5, 2001, McCastler reported continued low back pain, and another MRI of the lumbar spine was ordered.  R. 175-76.[8]  The MRI was conducted on November 10, 2001.  R. 249.  The MRI revealed a disc herniation at the L5-S1 with "some contact to the right S1 nerve root.  R. 174.  The physician's assistant recommended epidural steroid injections of the lumbar spine.  R. 174.  On November 26, 2001, Dr. Michael Rubeis, injected McCastler with an epidural steroid in the lumbar spine.  R. 244.

On December 10, 2001, McCastler present to Dr. Robison with worsening and persistent left knee pain which had not improved through conservative measures.  R. 173.  McCastler stated she was willing to consider "debridement arthroscopy with the understanding that it may or may not improve her discomfort."  R. 173.  On January 7, 2002, McCastler returned with persistent pain in her left knee.  R. 172.  An examination revealed the following:

> She has no pain with internal or external rotation of her left hip.  Her left knee has crepitance with range of motion.  She has tenderness anteromedially along her medial joint line.  She has mild pain with forced full flexion.  She has no appreciable ligamentous laxity.

R. 172.    On January 11, 2002, McCastler underwent the surgical procedure of patellar chondroplasty of the left knee. R. 241-42.  The surgery was performed by Dr. Robison.  *Id.*  On January 21, 2002, one week after the surgery, McCastler was doing well and was able to walk with a cane.  R. 170.  Dr. Robison offered McCastler physical therapy which she declined.  R. 170.  On March 11, 2002, MCastler returned for a post-surgery follow up with Dr. Robison.  R. 165.  She reported that she still gets some stiffness and she cannot walk for long periods, but the knee felt better than it did before the surgery.  R. 165.

---

[8] McCastler's anti-inflammatory was also changed.  R. 175.

On January 22, 2002, McCastler returned to Dr. Barnard for a follow up regarding her hands. R. 169. She indicated some occasional pain in the right forearm and moderate pain in the right thumb, but wearing the splints resulted in noticeable improvement. R. 169.

On April 2, 2002, McCastler presented with sharp pain in her lower back, mostly on her right side. R. 164.

> On physical exam she was able to heel and toe walk. She did have some slight discomfort, but was able to do so without any difficulty. Motor power showed no deficits throughout the bilateral lower extremities. Tension signs were negative. Sensation was intact.

R. 164. The physician's assistant recommended booster epidurals. R. 164. On April 11, 2002, Dr. Rubeis injected McCastler's lumbar spine with epidural steroids. R. 240.

On April 18, 2002, McCastler presented to Dr. Barnard complaining of pain in her right thumb. R. 162-63. Dr. Barnard diagnosed McCastler as having basilar arthritis, more intense on the right than on the left. R. 163. Dr. Barnard injected the basilar joint of the right thumb with Xylocaine and Celestone, and prescribed Bextra. R. 163. On May 16, 2002, McCastler returned to Dr. Barnard and upon examination showed no active swelling around the basilar joint of the right thumb, good thumb control, and excellent range of motion of the fingers. R. 161.

On June 6, 2002, McCastler returned with continued pain in her lower back, and stated that the booster injection did not help her pain symptoms. R. 160. On June 13, 2002 an MRI was taken of her lumbar spine. R. 238-39. The MRI revealed that the disc herniation of the L5-S1 was unchanged from the previous MRI, some synovitis was apparent at the level above the L5-S1, and

degenerative changes were present throughout the L5-S1 region.  R. 159.[9] The physician's assistant discussed epidural injections and facet blocks with McCastler.  R. 159.

On July 8, 2002, McCastler presented to Dr. Robison with worsening right knee pain.  R. 158.  An examination of the right knee revealed the following:

> Her right knee has no effusion.  She has diffuse peripatellar tenderness and significant patellofemoral crepitance.  She has mild tenderness along her medial joint line.  She has no appreciable ligamentous laxity.

R. 158.  Dr. Robison explained to McCastler that it was likely she had chondromalacia similar in her right knee to her left knee.  R. 158.

On September 30, 2002, McCastler presented to Dr. Munson for persistent lower back pain.  R. 155-56.

> The patient has had epidural steroids which she said did not significantly relieve her symptoms.  She describes her pain as being primarily that of low back pain with rare right buttock discomfort, primarily described as an aching low back pain.  It is aggravated by prolonged sitting and mechanical activities and relieved by supine positioning with a pillow between her legs.  She rates her discomfort as a 3 on a pain scale of 10.

R. 156.  Dr. Munson reported that McCastler had a full range of motion of the lower back, and "[t]here is full lateral bend and extension without pain."  R. 156. No spasms and no tenderness were present in the lumbar spine.  R. 156.  Dr. Munson could not reproduce the pain complained of by McCastler.  R. 156.  Dr. Munson reviewed McCastler's previous MRI and found no "significant disc herniation, just some mild disc degeneration at L5-S1.  R. 156.  Dr. Munson recommended physical therapy.  R. 155.

---

[9] Synovitis is generally the same as arthritis.  *See Stedman's Medical Dictionary*, 26th Ed. (1995).

On April 16, 2003, McCastler returned to Dr. Barnard with pain or triggering in her right middle finger. R. 151. Dr. Barnard injected her right middle finger with Xylocaine and Celestone. R. 151.

The record indicates that McCastler was not treated again for any of her conditions or symptoms until April 7, 2004. Doc. No. 149. On that date, Dr. Barnard diagnosed McCastler with osteoarthritis in the right middle finger and basilar arthritis in both thumbs. R. 148. Dr. Barnard recommended a bone scan of both hands. R. 148. On April 15, 2004, McCastler underwent a bone scan of both hands. R. 236-37. On May 3, 2004, McCastler presented with tenderness of right middle finger, and difficulty going to full flexion due to pain. R. 147. On August 4, 2004, Dr. Barnard recommended a trigger release of the right middle finger and an arthroscopy of the right wrist. R. 144. On August 10, 2004, McCastler underwent the surgery, which revealed chronic synovitis of the right wrist. Doc. No. 234.

On May 10, 2004, McCastler presented to Dr. Robison with persistent and worsening right knee pain. R. 145. McCastler reported that the pain gets so bad that "she cannot get [up] and down out of a chair or up and down off of the toilet." R. 145. X-rays revealed significant degenerative changes under her knee cap. R. 145. Dr. Robison injected the medial compartment of her right knee with Knealog and Marcaine. R. 145.

On September 29, 2004, McCastler returned to Dr. Barnard for a follow up after her wrist and finger surgery. R. 140. McCastler reported mild pain in the thumb, but no triggering of the right middle finger. R. 140. She had a full range of motion of the fingers. R. 140. Overall, Dr. Barnard's notes reveal that McCastler seemed to be doing well. R. 140.

On December 16, 2004, McCastler filed a claim for a period of disability and disability insurance benefits, claiming disability as of June 19, 2001. R. 73-75. The claim was denied on March 8, 2005. R. 65-67. On March 8, 2005, McCastler requested reconsideration of her claim. R. 63. On June 7, 2005, McCastler's claim on reconsideration was also denied. R. 60. On June 23, 2005, McCastler requested a hearing before an administrative law judge. R. 59.

On February 18, 2005, McCastler was referred for a consultative examination before Dr. Alex C. Perdomo. R. 109-111. After detailing the above stated history, Dr. Perdomo's report states the following:

> Physical Exam: Revealed a pleasant, obese female in no acute distress, alert and oriented. She was seen walking down the hallway with the assistance of a cane. She was able to walk for a short distance without a cane, but showed significant antalgic posture. She was comfortable during the exam and was able to get on and off the examining table without any problems.
> . . .
> Bilateral knee crepitus with peripatellar tenderness noticed. Also, tenderness over the wrist and metacarpal phalangeal joints noticed. Full range of motion of the upper, although painful bilateral shoulder abduction noticed due to radiating pain in to the mid and lower back. Also, very painful wrist and hand movements, as well as painful gripping noticed. Full range of motion of the knees, although movements were painful. Range of motion of the hips was decreased with bilateral hip flexion 45 degrees due to hip pain. Patient was unable to squat, or stand on her toes or heels due to complaints of knee and lower back pain.
> Back: Revealed no deformities with moderate tenderness over the lumbar paraspinal muscles and lower spinous process. Full range of motion of the cervical spine, although movements were painful, mostly extension. Thoracolumbar spine range of motion was decreased with forward flexion 40 degrees, extension 0 degrees, lateral flexion and rotation 15 degrees both right and left. Negative straight leg raise.
> . . .
> Impression:
> 1. History of chronic lower back pain with moderate to severe musculoskeletal functional limitations on physical examination.

14

Osteoarthritis and degenerative disc disease by history.
2. History of osteoarthritis of the knees.
3. Bilateral wrist and hand pain with status-post bilateral carpal tunnel release.
4. Obesity.

. . .

Recommendations: Review of medical records shows amble documentation of patient's history of osteoarthritis of her knees and hands. Also, there is mention of MRI of the lumbosacral spine done in 09/03 with no significant disc herniation, but mild degenerative disc disease and osteoarthritis noticed. She could benefit from weight loss, as well as more aggressive physical therapy and home exercise program for back, knee, and hand conditioning. She could also benefit from a referral to a pain management specialist for more aggressive pain management control. She can stand and walk for two hours in an eight-hour workday with normal breaks. She should be allowed to use a cane for ambulation. She could sit for eight hours in an eight-hour workday with normal breaks. She can occasionally lift and carry, <u>but should limit the weightlifting to no more than five pounds</u>. She should also avoid bending, stooping, crouching, squatting, or kneeling. Due to her painful hands, she should avoid repetitive use of her hands, such as using a keyboard or frequent dialing of a phone.

R. 110-11 (emphasis added).

On March 7, 2005, a state agency consultant provided a Physical Residual Functional Capacity Assessment ("RFC") on McCastler. R. 112-119.[10] The state agency consultant made a primary diagnosis of osteoarthritis and a secondary diagnosis of obesity. R. 112. The state agency consultant opined that McCastler's conditions and symptoms resulted in the following exertional limitations: (1) occasionally lifting and/or carrying a maximum ten pounds; (2) frequently lifting and/or carrying a maximum of ten pounds; (3) standing and/or walk walking at least two hours in an eight hour workday; (4) sitting with normal breaks for about six hours in an eight hour workday; and (5) no limitations in pushing and/or pulling. R. 113. The state agency consultant

---

[10] The state agency consultant's signature is illegible and not mentioned elsewhere in the record.

based his/her conclusions on Dr. Perdomo's consultative examination. R. 113. The state agency consultant opined that McCastler's postural limitation prevent her from ever climbing a ladder, rope, or scaffolds, but she could occasionally climb a ramp or stairs, balance, stoop, kneel, crouch, and crawl. R. 114. The state agency consultant further opined that McCastler had no manipulative, visual, communicative, or environmental limitations. R. 115-16. The state agency consultant stated that McCastler's medically determinable impairments of osteoarthritis and obesity were appropriate for her symptoms. R. 117.

On April 21, 2005, McCastler presented to Dr. Barnard with renewed numbness in her hands and pain in the left wrist. R. 134. Dr. Barnard noted that she was very tender over the scapholunate area, and there were physical signs of increased pain in the left wrist. R. 134. Dr. Barnard recommended an arthogram of the left wrist and another EMG. R. 133.

On June 6, 2006, Dr. Murthy Ravipati, a state agency consultant provided another RFC. R. 120-27. Dr. Ravipati made a primary diagnosis of osteoarthritis, a secondary diagnosis of bilateral carpal tunnel syndrome, and a third diagnosis of obesity. R. 120. Dr. Ravipati provided the same RFC as the other state agency consultant. R. 120-125. Dr. Ravipati stated that McCastler's medically determinable impairments were consistent with her symptoms. R. 125.

On January 9, 2006, McCastler presented to Dr. Robison with persistent bilateral knee pain, with the left being greater than the right. R. 130-31. According to Dr. Robison's notes, McCastler had not been seen for her knee pain since May of 2004. R. 131. "She said she has just been dealing with the pain." R. 131. McCastler reported that the last injection relieved her pain for about two weeks. R. 131. The pain in her left knee was worsening, but without any antecedent trauma. R. 131. McCastler reported that she was not taking any anti-inflammatories

and she did "not want to do the viscosupplementation because of the possibility of avian flu." R. 131. McCastler showed good range of motion, full extension, and a decent quad set. Dr. Robison prescribed ibuprofen. R. 130.

On January 30, 2006, McCastler presented to Dr. Barnard with pain in her right thumb. R. 128-29. X-rays showed some arthritic changes developing within the joints of the thumb and Dr. Barnard diagnosed tendonitis of the flexor tendon of the right thumb. R. 129. Dr. Barnard injected McCastler's right thumb with Xylocaine and Kenalog, and recommended that she continue wearing the splints. R. 128.

On August 22, 2006, a hearing was held before Administrative Law Judge Robert D. Marcinkowski (the "ALJ"). R. 294-313. Attorney Michael Shiffman represented McCastler at the hearing. R. 294. McCastler was the only person to testify at the hearing. R. 294-313. At the hearing, McCastler stated that she was terminated from her job after returning from carpal tunnel surgery. R. 301. McCastler testified that she is unable to work due to her back problems, a slipped disc pressing on a nerve, arthritis in both knees, hands, and shoulders. R. 302. Regarding her back problems, McCastler testified that she continues to have a lot of pain, tightness, and numbness radiating down into her legs. R. 302. Regarding her knees, McCastler testified that she has a lot of pain in both knees whenever she bends them because the cartilage is torn in her kneecaps. R. 302-03. She testified that she always walks with a cane and sometimes a walker. R. 303. Regarding her hands, McCastler testified that she has lots of pin in her wrists, fingers, and thumbs on a day-to-day basis. R. 303. Regarding her shoulders, McCastler testified that she experiences pain whenever she lifts her hands. R. 304.

McCastler testified that she can only walk half a block before having to stop.  R. 304.  She stated that she has difficulty with standing and sitting.  R. 305.  McCastler testified that she can only stand for five minutes before having to sit down, and she can only sit for ten minutes before having to stand up.  R. 305.  McCastler stated that she can only lift about two pounds with either hand.  R. 305.  She testified that she can no longer do any household work and she can only write with a pen briefly because of the pain in her wrists.  R. 306.   McCastler stated that she needs help to bathe, groom and dress herself.  R. 306.  McCastler testified that spends most of the day "laying around the couch," and takes naps every two hours.  R. 307.  She testified that she can only sleep for thirty minutes before the pain wakes her up.  R. 307-08.

On September 26, 2006, the ALJ issued a decision that McCastler was not disabled finding the following:

1.      The claimant met the insured status requirements the Social Security Actc through December 31, 2004.

2.      The claimant has not engaged in substantial gainful activity since June 19, 2001, the alleged onset date.

3.      The claimant has the following combination of severe impairments: osteoarthritis, bilateral carpal tunnel syndrome, degenerative disc disease, and bilateral degenerative changes of the knees with prior surgery.

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity for sedentary work.  Specifically, the claimant is able to sit for 6 hours or more in an eight hour workday, stand and/or walk 2 hours in an eight hour work day, lift up to 10 pounds occasionally, and occasionally perform postural activities except for balancing.

6.      The claimant is unable to perform any past relevant work.

7. The claimant was born on February 9, 1963, and was 38 years old on the alleged disability onset date, which is defined as younger individual age 18-44 (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of "not disabled" (See 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a "disability," as defined in the Social Security Act, from June 19, 2001, through the date of this decision.

R. 33-34. On November 6, 2006, McCastler requested a review of the ALJ's decision by the Appeals Council (R. 10-24), and on August 24, 2007, the Appeals Council denied review. R. 4-6. McCastler also presented new evidence to the Appeals Council. See R. 281-293.[11] The new evidence consisted of reports by Dr. Barnard, Dr. Robison, and Dr. Tall from follow up visits on September 11, 2006 through April 11, 2007. R. 282-293. McCastler presented with similar complaints of pain in her hands, wrists, knees, and lower back. *Id*. The new evidence is consistent with the existing medical record. An evaluation of the new evidence, however, is not material to the issues raised by McCastler in this appeal.

On October 22, 2007, McCastler timely appealed the Appeals Council's decision to the United States District Court. Doc. No. 1. On May 27, 2008, McCastler filed a memorandum of

---

[11] When a plaintiff submits additional evidence to the Appeals Council and argues that the Appeals Council erred in denying review, the court must determine whether the Commissioner's decision is supported by substantial evidence on the record as whole. *See Ingram v. Commissioner of Social Security*, 496 F.3d 1253, 1262, 1266 (11th Cir. 2007); *Hummel v. Astrue*, No. 8:06-CV-725-T-EAJ, 2007 WL 2492460, *7 (M.D.Fla. Aug. 30, 2007) (under *Ingram*, the court reviews whether the decision to deny benefits is supported by substantial evidence in the record as a whole, including evidence submitted to the Appeals Council).

law in support of her appeal. Doc. No. 19. On July 25, 2008, the Commissioner filed a memorandum in support of his decision that McCastler was not disabled. Doc. No. 20. The appeal is now ripe for determination.

## II.    THE PARTIES' POSITIONS

McCastler assigns three errors to the ALJ. First, McCastler claims that the ALJ erred in determining that McCastler has the RFC to perform sedentary work. Specifically, McCastler claims that ALJ erred when he determined McCastler can occasionally lift and carry ten pounds when the consulting physician concluded that she was unable to lift over five pounds. Second, McCastler claims the ALJ erred by failing to utilize the testimony of a vocational expert where the record shows that McCastler suffered from the non-exertional impairment of pain. Third, McCastler claims the ALJ erred by failing to make a specific finding as to McCastler's credibility.

The Commissioner argues that substantial evidence supports his decision to deny McCastler disability. The Commissioner maintains that the ALJ had sufficient evidence to properly assess McCastler's RFC was for sedentary work. The Commissioner also argues that the ALJ properly relied on the Medical-Vocational Guidelines (the "Grids") and testimony of a vocational expert was not required. In the Commissioner's memorandum, he does not specifically address whether the ALJ erred by failing to make a specific finding as to McCastler's credibility, but the Commissioner argues that the medical record does not support her subjective allegations of pain. Doc. No. 20 at 5-6.

### III. LEGAL STANDARDS

### A. THE ALJ'S FIVE-STEP DISABILITY ANALYSIS

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled. *See* 20 CFR §§ 404.1520(a), 416.920(a). The steps are followed in order. If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

At step one, the ALJ must determine whether the claimant is engaging in substantial gainful activity. 20 CFR §§ 404.1520(b), 416.920(b). Substantial gainful activity ("SGA") is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves performing significant physical or mental activities. 20 CFR §§ 404.1572(a), 416.972(a). "Gainful work activity" is work that is usually performed for pay or profit, whether or not a profit is realized. 20 CFR §§ 404.1572(b), 416.972(b). Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that he has demonstrated the ability to engage in SGA. 20 CFR §§ 404.1574, 404.1575, 416.974, 416.975. If an individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, the ALJ must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe." 20 CFR §§ 404.1520(c), 416.920(c). An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. An impairment or combination of impairments is "not severe" when medical or other

evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 CFR §§ 404.1521, 416.921.

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993). Accordingly, the ALJ must make it clear to the reviewing court that the ALJ has considered all alleged impairments, both individually and in combination, and must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. *See Jamison v. Bowen*, 814 F.2d 585, 588-89 (11th Cir. 1987); *Davis*, 985 F.2d at 534. A remand is required where the record contains a diagnosis of a severe condition that the ALJ failed to consider properly. *Vega v. Comm'r*, 265 F.2d 1214, 1219 (11th Cir. 2001). If the claimant does not have a severe medically determinable impairment or combination of impairments, he is not disabled. If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

At step three, it must be determined whether the claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (the "Listing(s)"). 20 CFR §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926. If the claimant's impairment or combination of impairments meets

22

or medically equals the criteria of a Listing and meets the duration requirement (20 CFR §§ 404.1509, 416.909), the claimant is disabled. If it does not, the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, the ALJ must first determine the claimant's RFC. 20 CFR §§ 404.1520(e), 416.920(e). An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations secondary to his established impairments. In making this finding, the ALJ must also consider all of the claimant's impairments, including those that may not be severe. 20 CFR §§ 404.1520(e), 404.1545, 416.920(e), 416.945.

Next, the ALJ must determine step four, whether the claimant has the RFC to perform the requirements of his past relevant work. 20 CFR §§ 404.1520(f), 416.920(f); *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, and pull. *See* 20 C.F.R. § 404.1545(b). The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). If the claimant is unable to establish an impairment that meets the Listings, the claimant must prove an inability to perform the claimant's past relevant work. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established. In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA. 20 CFR §§ 404.1560(b), 404.1565, 416.960(b), 416.965. If the claimant has the RFC to do his past relevant work, the claimant is not disabled. If the claimant is unable to do any past relevant work, the analysis proceeds to the fifth

and final step.

At the last step of the sequential evaluation process (20 CFR §§ 404.1520(g), 416.920(g)), the ALJ must determine whether the claimant is able to do any other work considering his RFC, age, education and work experience. In determining the physical exertional requirements of work available in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy. 20 C.F.R. § 404.1567. If the claimant is able to do other work, he is not disabled. If the claimant is not able to do other work and his impairment meets the duration requirement, he is disabled. Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration. In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the RFC, age, education and work experience. 20 CFR §§ 404.1512(g), 404.1560(c), 416.912(g), 416.960(c).

**B.     THE STANDARD OF REVIEW**

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (*citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d at 584 n.3; *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405(g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't of Health & Human Serv.*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord*, *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636-37 (11th Cir. 1984). A claimant may be entitled to an immediate award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks

substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

The district court may remand a case to the Commissioner for a rehearing under sentences four or six of 42 U.S.C. § 405(g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089-92, 1095, 1098 (11th Cir. 1996). To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's RFC); *accord*, *Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30 (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work).[12]  In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

---

[12] On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (on remand ALJ required to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (on remand ALJ required to consider the need for orthopedic evaluation).  After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. *Jackson*, 99 F.3d at 1089, 1095.

42 U.S.C. § 405(g). To remand under sentence six, the claimant must establish: 1) that there is new, non-cumulative evidence; 2) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3) there is good cause for failure to submit the evidence at the administrative level. *See Jackson*, 99 F.3d at 1090-92; *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *Keeton v. Dept. of Health & Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994). A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. *Jackson*, 99 F.3d at 1095.[13]

## IV.     WHETHER THE ALJ ERRED IN DETERMINING McCASTLER'S RFC

McCastler argues that the ALJ erred in determining that McCastler has the RFC to perform sedentary work. The ALJ determined that McCastler has the RFC to sit for six hours or more in an eight hour workday; stand and/or walk two hours in an eight hour workday; occasionally perform postural activities except for balancing; and lift or carry up to ten pounds occasionally. R. 30. Dr. Ravipati and the other state agency non-examining consultant each determined that McCastler has the ability to occasionally lift or carry a maximum of ten pounds. R. 113, 121. Both non-examining consultants based their findings on Dr. Perdomo's examination. R. 113, 121. However, Dr. Perdomo's findings specifically state that McCastler "can occasionally lift and carry, but should limit the weightlifting to no more than five pounds." R. 110-11.

---

[13] With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact. *Id.* The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings. *Id.*

McCastler argues that the ALJ did not specifically state what weight he gave to the opinions of Dr. Perdomo or state why he accepted the opinions of the non-examining physicians regarding the amount of weight McCastler could occasionally lift or carry over Dr. Perdomo's opinion. Doc. No. 19 at 11, 13. McCastler argues that the ALJ's failure amounts to reversible error. Doc. No. 19 at 14. The Commissioner maintains that the ALJ properly considered Dr. Perdomo's opinions and found them generally consistent with McCastler's ability to perform sedentary work. Doc. No. 20. Alternatively, the Commissioner argues that Dr. Perdomo did not examine McCastler until two months after McCastler's insured status ended, and Dr. Perdomo did not indicate in his report that the limitations he found were apparent before her insured status ended. Doc. No. 20 at 14. Furthermore, the Commissioner argues that Dr. Perdomo's opinions are inconsistent with his own findings and the medical record as a whole. *Id*. at 14-15. Thus, the Commissioner maintains the ALJ properly relied on the non-examining consultants RFC. *Id*. at 15.

Sedentary work involves the following:

> . . . lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. . . .

20 C.F.R. § 404.1567(a). If a claimant can never lift or carry anything over five pounds, as Dr. Perdomo's opinion of McCastler indicated, then that does not automatically mean the claimant is disabled. *Moore v. Astrue*, 256 Fed.Appx. 330, 333 (11th Cir. 2007). However, such a finding would necessitate an ALJ consulting with a vocational expert. *Id*. Thus, the ALJ's determination regarding McCastler's ability to lift or carry is not to be taken lightly.

Weighing the opinions and findings of treating, examining, and non-examining physicians is an integral part of steps four and five of the AJL's sequential process for determining disability. The opinions or findings of a non-examining physician are entitled to little weight when they contradict the opinions or findings of an examining physician. *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988). The ALJ may, however, reject any medical opinion if the evidence supports a contrary finding. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986). Nonetheless, the ALJ must state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987).

Regarding Dr. Perdomo's consultative examination, the ALJ stated the following:

> The claimant's date last insured is December 31, 2004. Therefore, evidence after this date is not decisive to the issue of disability. However, the undersigned does note that a consultative examination in February of 2005 revealed no neurological deficits, a negative straight leg raise, a normal range of motion in the cervical spine and knees, and no deformities in the back. Tenderness and pain in the low back and knees, as well as tenderness and pain with wrist and hand movements, were noted. However, even with her moderate to severe limitations, the claimant was still considered able to stand and/walk 2 hours in an eight-hour workday, able to sit for 8 hours in an eight-hour workday, and able to occasionally lift and carry. This assessment is also consistent with [the non-examining state agency consultant's findings].

R. 32. The ALJ's statement that Dr. Perdomo's assessment is consistent with the non-examining consultants is not accurate.[14] As set forth above, the differences between their respective opinions

---

[14] In the ALJ's decision, he states the following: "The undersigned also notes that at no time has any treating physician described the claimant as disabled or unable to work, or for that matter significantly limited in any way." R. 32 (emphasis added). While it is true that the record contains no statement from a treating physician describing the claimant as disabled or unable to work, the ALJ's statement that no treating physician described McCastler as "significantly limited in any way" is not accurate. *See* R. 197, 210-11. This inaccuracy alone is not grounds for reversal, but the Commissioner should be cognizant of it on remand. *See Rhodes v. Astrue*, 2008 WL 360823 (M.D. Fla. Feb. 8, 2008) (single inaccurate statement by ALJ concerning medical record did not require remand where substantial evidence otherwise supported ALJ's decision).

are significant. *See* 20 C.F.R. § 404.1567(a). The ALJ is required to state with specificity the weight accorded to each medical opinion at steps four and/or five of the sequential process for determining disability. *Sharfarz*, 825 F.2d at 279. However, the ALJ failed to even mention that an examining physician had determined that McCastler did not have the RFC to ever lift or carry anything over five pounds, much less provide any reasons for discounting that opinion. Accordingly, the Court is unable to determine whether substantial evidence supports the ALJ's decision. Thus, the undersigned recommends that the case be remanded under sentence four of § 405(g) for the ALJ to make specific findings regarding the weight accorded to examining and non-examining physicians. If the ALJ discounts the opinions of any physician he/she should state specific reasons for doing so.[15]

## V.    CONCLUSION

Based on the forgoing, the undersigned recommends that the ALJ's decision be **REVERSED and REMANDED** to the Commissioner under sentence four of § 405(g) for further proceedings to allow the ALJ to make specific findings regarding the weight accorded to examining and non-examining physicians.[16]

Failure to file written objections to the proposed findings and recommendations contained in this report within eleven (11) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

---

[15] *See* supra n. 13.

[16] Because it is recommended that the ALJ's decision be reversed and remanded under sentence four of § 405(g), it is unnecessary to reach the other arguments raised by McCastler. However, the Court notes that pain is generally considered a non-exertional impairment because it can affect concentration, posture, reaching, sitting/standing duration and lifting. *See Scott v. Shalala*, 30 F.3d 33, 34 (5th Cir. 1994). If a non-exertional impairment exists, an ALJ may use Grids as framework to evaluate vocational factors, but must also introduce independent evidence, preferably through a vocational expert's testimony, of the existence of jobs in the national economy that a claimant can perform. *Wolfe v. Chater*, 86 F.3d 1072, 1077-78 (11th Cir. 1996).

Recommended at Orlando, Florida on February 27, 2009.


_____
GREGORY J. KELLY
UNITED STATES MAGISTRATE JUDGE


The Court Requests that the Clerk
Mail or Deliver Copies of this Order to:

The Honorable John Antoon II

Shea A. Fugate
Law Office of Shea Fugate
1800 Pembrook Dr., Suite 300
P.O. Box 940989
Maitland, Florida        32794

Mary Ann Sloan, Regional Chief Counsel
Dennis R. Williams, Deputy Regional Chief Counsel
Brian C. Huberty, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia        30303-8920

The Honorable Robert D. Marcinkowski
Administrative Law Judge
Office of Disability Adjudication and Review
Suite 300
3505 Lake Lynda Dr.
Orlando, FL 32817-9801